**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1527-18T3

STEVE RAMSHUR,

     Plaintiff-Respondent,

v.

DEPARTMENT OF ENVIRONMENTAL
PROTECTION, MATTHEW J. COEFER,
Records Custodian in the New Jersey
Department of Environmental Protection,

     Defendant,

and

LIBERTY NATIONAL GOLF COURSE,
LLC,[1] a New Jersey limited liability
company,

     Defendant-Appellant.

_____

     Argued December 16, 2019 – Decided February 19, 2020

     Before Judges Rothstadt and Mitterhoff.

---

[1] WA Golf Company, LLC was incorrectly designated as Liberty National Golf Course, LLC.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0831-18.

Nicole Bianca Dory argued the cause for appellant WA Golf Company, LLC (Connell Foley LLP, attorneys; Kevin J. Coakley, William Nevins Mc Cann, and Nicole Bianca Dory, of counsel; Nicole Bianca Dory and Michael J. Affrunti, on the briefs).

Walter M. Luers argued the cause for respondent.

PER CURIAM

WA Golf Company, LLC (WA Golf), which operates Liberty National Golf Club (Liberty National), appeals from a July 25, 2018 order compelling it to disclose to plaintiff Steve Ramshur the bid it submitted in response to a November 21, 2017 request for proposals (RFP) issued by the New Jersey Department of Environmental Protection (DEP). WA Golf also appeals from an October 22, 2018 order awarding plaintiff attorneys' fees.

Plaintiff submitted a request to the DEP under the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, seeking access to bids submitted in response to the RFP. Matthew J. Coefer, a DEP records custodian, denied plaintiff's request, so plaintiff filed an order to show cause and a verified complaint against the DEP, Coefer, and Liberty National, seeking to compel disclosure of Liberty National's bid. On July 25, 2018, after a hearing on the order to show cause, the judge issued an order compelling Liberty National to

disclose its bid to plaintiff, after determining that the OPRA exemptions did not preclude disclosure of the bid and that the common law right to access to public records also mandated disclosure. The judge awarded plaintiff attorneys' fees, and the parties agreed to an amount in a consent order dated October 22, 2018.

Liberty National appeals, contending that its bid is protected by various OPRA exemptions and that plaintiff failed to show that he is entitled to disclosure under the common law right of access to public records. Having reviewed the record, and in light of the applicable law, we affirm in part, reverse in part, and remand for an in camera review to ascertain whether Liberty National's bid contains information protected by the competitive advantage exemption, the trade secret and proprietary information exemption, or the security exemptions.

I.

We discern the following facts from the record. In 1983, the DEP purchased Caven Point, a twenty-one-and-a-half-acre peninsula with a large stretch of natural beach along the Hudson River in Liberty State Park. Although Caven Point is accessible from the park and surrounding neighborhoods, it is isolated from a large section of the park and largely borders the golf course

operated by Liberty National.  The DEP's purchase of Caven Point was partly funded by the New Jersey Green Acres Bond Act of 1978, L. 1978, c. 118.

On November 21, 2017, the DEP issued an RFP, "solicit[ing] proposals from qualified organizations to operate public or private outdoor recreational amenities within the Caven Point area."  The DEP aimed to "advance the use of . . . Caven Point to provide enhanced public or private recreational amenities while preserving or enhancing existing public recreational uses, natural resources, and ecological values of the site."  The RFP allowed bidders to submit a proposal for amenities that would be "reasonably . . . expected to result in a diversion and/or conversion," provided that the proposal detailed how the bidder would satisfy an additional compensation requirement.  Regardless of the proposed use, the DEP could reject any proposal if doing so was in the public interest.

The RFP included the following provisions relevant to public disclosure of submitted proposals and confidentiality during the proposal evaluation and selection process:

1.4.6  Contents of Proposal

The entire content of every proposal that is opened and read shall become a public record, notwithstanding any statement to the contrary made by a bidder in its proposal.  As public records, all proposals

4

A-1527-18T3

are available for public inspection with the filing of an [OPRA] request with the [DEP].

. . . .

6.5    Negotiation and Best and Final Offer (BAFO)

After evaluating proposals, the [DEP] may enter into negotiations with one bidder or multiple bidders . . . . Negotiations will be structured by the [DEP] to safeguard information and ensure that all bidders are treated fairly.

. . . .

All contacts, records of initial evaluations, any correspondence with bidders related to any request for clarification, negotiation or BAFO, any revised technical and/or price proposals, the [e]valuation [c]ommittee [r]eport and the [a]ward [r]ecommendation, will remain confidential until a [n]otice of [i]ntent to [a]ward a contract is issued.

On December 22, 2017, Liberty National submitted a bid. On April 9, 2018, plaintiff submitted an OPRA request to the DEP, seeking a "copy of the entire content of every bid proposal" submitted in response to the RFP. Liberty National's bid was the only submission. Three days later, Coefer denied plaintiff's request, explaining that the competitive advantage exemption, see N.J.S.A. 47:1A-1.1, exempted Liberty National's bid from public disclosure. Consequently, on April 19, 2018, plaintiff filed an order to show cause and a verified complaint against the DEP, Coefer, and Liberty National, alleging he

was denied access to Liberty National's bid in violation of OPRA and the common law right of access to public records. He requested disclosure of the bid and an award of attorney's fees.

Meanwhile, in a letter dated May 3, 2018, the DEP rejected Liberty National's bid as "materially nonresponsive to a number of essential requirements." In explaining the bid's deficiencies, the DEP identified some of Liberty National's proposed terms, including rent payments and the amount of compensation it would pay for deviating from the requirement that Caven Point be used for recreational purposes. The rejection letter "also serve[d] as notice that the DEP has exercised its right, in its sole discretion, to reject all bids, responsive or otherwise, and not to pursue the project at this time." The DEP did not know whether it would "re-bid the same or similar RFP."

In opposition to plaintiff's order to show cause, Liberty National's chief financial officer (CFO) certified that, as part of its bid, "Liberty National submitted confidential and sensitive business documents and information, including proprietary information related to [its] business operations and financial viability." These documents were relevant to both its strategy in competing for the RFP and "its continued viability as a prominent, private golf course." He identified the following documents contained in the bid, which he

asserted revealed Liberty National's financing and business operations: a certified financial statement; an asset confirmation letter; a draft proposed lease agreement that included proposed monetary lease terms, a budget proposal, insurance policy terms, and confidential information revealing construction and design plans; an expert valuation of Caven Point; business registration forms; stock ownership forms; revenue summaries from past events; proposed operating and maintenance hours for Caven Point; advertising and marketing proposals; "[s]ensitive security information . . . developed in conjunction with multiple federal and state law enforcement agencies;" and liquor license information. He claimed that disclosure of this information "would impair the ability of Liberty National to compete for the subject RFP should [the] DEP decide to reissue the RFP . . . . and would hinder Liberty National's ability to stay competitive amongst other golf courses in the region," specifically with regard to hosting the PGA TOUR.

The chief operating officer (COO) of PGA TOUR Golf Course Properties, Inc., a subsidiary of PGA TOUR, also opposed plaintiff's order to show cause. He certified that "Liberty National is currently under a long[-]term contract with the PGA TOUR through which it is a recognized championship golf course with an obligation to maintain its existing golf course in exchange for its right to host

future professional golfing events." Liberty National "routinely design[s] and re-design[s] [its] . . . course[] in order to . . . compete for the right to host certain championship golfing events." The COO further certified that the PGA Tour's "professional engineers, architects and other professionals collaborate with [Liberty National] and its engineers, architects, and other personnel in order to facilitate the proper design, construction and management of its projects in accordance with the necessary PGA TOUR standards." These designs "are kept confidential by and between the PGA TOUR and Liberty National." The COO claimed that disclosure of Liberty National's "golf course designs, construction plans, and security information would cause irreparable harm to the PGA TOUR's ability to maintain the integrity of its business relationships, as well as the safety of its patrons."

On July 24, 2018, the judge heard oral argument, after which she issued an oral decision compelling Liberty National to disclose its bid to plaintiff. She largely relied on section 1.4.6 of the RFP, which provided that "every proposal . . . shall become a public record . . . available for public inspection with the filing of an [OPRA] request." She added that section 6.5 of the RFP did not protect the bid because the DEP rejected it as nonresponsive, and there was no evidence that the DEP negotiated with or contemplated negotiating with Liberty

National.  The judge then discussed the OPRA exemptions in light of section 1.4.6, although she conducted no in camera review to ascertain the nature of the bid's contents.

The judge found that the record did not support a finding that nondisclosure was warranted to prevent unfair competitive advantage. According to the judge, that Liberty National's bid was the only submission "undercut the claims that there would be a competitive disadvantage," but even if there had been other bidders, Liberty National's bid would not have been useful because Liberty National was in a unique position as the operator of the golf course on the adjacent property.  As to the concern about PGA TOUR competitors gaining a competitive advantage, the judge found that the impact of disclosing the bid was speculative, since it would have become public if the DEP had awarded the project to Liberty National.  Likewise, the judge found that Liberty National's bid did not contain trade secrets, finding persuasive the lack of measures Liberty National took "to guard the secrecy of the information."

Next, the judge addressed N.J.A.C. 7:1D-3.2(c), which exempts "[r]ecords related to Green Acres . . . land acquisitions, program offerings, and active projects" when the "land transaction, program offering, or active project is actively under negotiation."  She found that the exemption did not apply because

there was no longer an active project, as the DEP had stopped pursuing the RFP and indicated no probability of pursuing the same project in the future.

Lastly, the judge addressed the common-law right to access government records. Upon balancing the parties' interests, she determined that the interest in public access to Liberty National's bid was greater than the DEP's interest in nondisclosure, due to section 1.4.6 of the RFP.

On July 25, 2018, the judge issued an order compelling Liberty National to disclose its bid to plaintiff. She also ordered the parties to resolve the matter of attorney's fees. On July 31, 2018, the parties signed a consent order, staying disclosure pending disposition of an appeal. On October 22, 2018, the parties signed a consent order, in which they agreed that the DEP would pay plaintiff's attorney $10,000 "in full and final satisfaction of [p]laintiff's claim for counsel fees." Payment was stayed pending disposition of an appeal, and the parties agreed that any party "may file an appropriate application to modify the counsel fee" if the July 25 order was modified or reversed on appeal. This appeal ensued.

On appeal, Liberty National contends that the judge erred in failing to adequately consider the OPRA exemptions after she improperly concluded that section 1.4.6 of the RFP mandated disclosure of Liberty National's bid. Liberty National also contends that plaintiff made an inadequate showing that he is

entitled to disclosure of the bid under the common law. Because Liberty National argues that plaintiff should not have prevailed before the trial judge, it also requests reversal of the attorney's fees award.

II.

We review de novo a decision as to the applicability of OPRA and its exemptions. In re N.J. Firemen's Ass'n Obligation, 230 N.J. 258, 273-74 (2017).

OPRA was enacted "to maximize knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process." Mason v. City of Hoboken, 196 N.J. 51, 64 (2008) (quoting Asbury Park Press v. Ocean Cty. Prosecutor's Office, 374 N.J. Super. 312, 329 (Law Div. 2004)). It allows society to "monitor the operation of our government [and] hold public officials accountable for their actions." Fair Share Hous. Ctr., Inc. v. N.J. State League of Municipalities, 207 N.J. 489, 502 (2011). Thus, we construe OPRA "in favor of the public's right to access." O'Boyle v. Borough of Longport, 218 N.J. 168, 184 (2014) (quoting N.J.S.A. 47:1A-1).

OPRA provides that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest." N.J.S.A. 47:1A-1. A government record includes "any . . . document . . . that has been made,

maintained or kept on file in the course of . . . official business by any . . . agency . . . of the State." N.J.S.A. 47:1A-1.1. If "[a] person . . . is denied access to a government record by the custodian of the record," he or she may initiate a proceeding in the Superior Court, and "[t]he public agency shall have the burden of proving that the denial of access is authorized by law." N.J.S.A. 47:1A-6.

The public's right to access government records is not absolute. See N.J.S.A. 47:1A-1.1; N.J.S.A. 47:1A-9. OPRA excludes various types of information from the definition of a government record, N.J.S.A. 47:1A-1.1, and also provides that it "shall not abrogate any exemption of a public record or government record from public access heretofore made pursuant to . . . [a] regulation promulgated under the authority of any statute or Executive Order of the Governor," N.J.S.A. 47:1A-9(a). "[C]ourt[s] must always maintain a sharp focus on the purpose of OPRA and resist attempts to limit its scope, absent a clear showing that one of its exemptions or exceptions incorporated in the statute by reference is applicable to the requested disclosure." Tractenberg v. Township of West Orange, 416 N.J. Super. 354, 378-79 (App. Div. 2010) (quoting Asbury Park Press, 374 N.J. Super. at 329).

We preface our discussion of the OPRA exemptions by determining that section 1.4.6 of the RFP does not compel us to mandate disclosure of Liberty

National's bid. Although section 1.4.6 provided that "[t]he entire content of every proposal that is opened and read shall become a public record," a party requesting to inspect Liberty National's bid was still required to file an OPRA request. As we previously noted, OPRA's purpose is "to maximize knowledge about public affairs," Mason, 196 N.J. at 64 (emphasis added), not to provide the public with an opportunity to seek information that is intended to remain confidential, see N.J.S.A. 47:1A-1.1. Thus, we conclude that the RFP was still governed by the OPRA exemptions. We now consider each exemption that Liberty National contends precludes disclosure of its bid.

A.

OPRA exempts from public disclosure "trade secrets and proprietary commercial or financial information obtained from any source." N.J.S.A. 47:1A-1.1. The statute does not define these terms, so we have considered definitions from other sources.

Our Supreme Court considered a definition of trade secrets included in the Restatement (First) of Torts § 757 cmt. b (Am. Law Inst. 1939): "A trade secret may consist of any . . . compilation of information which is used in one's business, and which gives . . . an opportunity to obtain an advantage over competitors who do not know or use it." Hammock by Hammock v. Hoffman-

13

LaRoche, Inc., 142 N.J. 356, 384 (1995) (quoting Smith v. BIC Corp., 869 F.2d 194, 199 (3d Cir. 1989)). Courts may also consider the following factors:

> (1) [T]he extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
>
> [Id. at 384 (quoting Smith, 869 F.2d at 200).]

We have also considered the Restatement (Third) of Unfair Competition § 39 (Am. Law Inst. 1995), which defines a trade secret as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford a potential economic advantage over others." Commc'ns Workers of Am. v. Rousseau, 417 N.J. Super. 341, 361 (App. Div. 2010).

In Rousseau, we considered both definitions and upheld the application of this exemption where the plaintiffs sought to compel disclosure of investment agreements between the State and various limited partnerships. Id. at 360-62. The agreements were not "made available to the general public," and "the contents of individual agreements [were not] known beyond the partnership."

14

Id. at 361-62. Further, "[t]he contents . . . are valuable not only to the general partners, but also to competitors," as they "outline the organizational structure of the partnerships, investment strategies, investment limitations, and other terms governing the relationship between the general partner and limited partners." Id. at 362.

In defining proprietary commercial or financial information, we have considered the ordinary meaning of the words. Id. at 355; see DiProspero v. Penn, 183 N.J. 477, 492 (2005). Proprietary commercial or financial information is information that is private or exclusively owned and is related to commerce, business, or "the management of money, banking, investments, and credit." Rousseau, 417 N.J. super. at 355-56 (citing American Heritage Dictionary of the English Language (4th ed. 2006)). We consider three factors to decide whether proprietary information must be disclosed: "the relationship of the parties at the time of disclosure, . . . the intended use of the information, . . . [and] the expectations of the parties." Id. at 356 (citing Lamorte Burns & Co. v. Walters, 167 N.J. 285, 299-301 (2001)). We have not required "an independent demonstration of confidentiality." Id. at 358.

Liberty National's CFO certified that its bid contained "confidential information revealing construction and design plans," and he asserted that

15

disclosure of such information "would hinder Liberty National's ability" to compete with other golf courses for hosting PGA TOUR events. The PGA TOUR subsidiary's COO certified that Liberty National's long-term contract with the PGA TOUR requires that Liberty National "maintain its existing golf course in exchange for its right to host future professional golfing events," which requires Liberty National to "routinely design and re-design [its] . . . course[] in order to . . . compete for the right to host certain championship golfing events." He further certified that these designs "are kept confidential by and between the PGA TOUR and Liberty National."

Liberty National's golf course designs and construction may be "sufficiently valuable and secret to afford a potential economic advantage over others," Rousseau, 417 N.J. Super. at 361 (quoting Restatement (Third) of Unfair Competition § 39), and Liberty National and the PGA TOUR have indicated that the designs are intended to remain confidential, see Hoffman-LaRoche, 142 N.J. at 384. See also Rousseau, 417 N.J. Super. at 355-56 (discussing proprietary information). However, because we are unable to review the contents of Liberty National's bid, we remand for in camera review to ascertain whether the bid includes construction and design information that amounts to a trade secret or proprietary information. If the bid contains such

information, the judge may consider whether to require disclosure of the entire bid with the exempted portions redacted.

## B.

OPRA provides for a competitive advantage exemption, which protects from disclosure "information which, if disclosed, would give an advantage to competitors or bidders." N.J.S.A. 47:1A-1.1. A "mere potential" that disclosure would confer an advantage is insufficient. Tractenberg, 416 N.J. Super. at 379.

In Tractenberg, we declined to apply this exemption where an individual sought disclosure of property appraisals obtained by the Township of West Orange in its pursuit to acquire a parcel of private land. Id. at 360-62, 379. We recognized that there was only a "mere potential for future negotiations" between the Township and landowner, and the Township failed to make "a strong showing that negotiations [were] probable." Id. at 379. To apply the exemption under those circumstances would "subvert[] the broad reading of OPRA as intended by the Legislature." Ibid. (quoting Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519, 535 (2005)).

By contrast, in Rousseau, 417 N.J. Super. at 362, we upheld the application of this exemption. We agreed with the trial judge's finding that "[a]ny competitor knowing when a fund's strategy would induce it to buy or sell

would enjoy an advantage over the fund." Ibid. We added "that disclosure of . . . the agreements would provide a competitive advantage not only to other private equity funds but also to other investors interested in the same sectors, companies, or properties." Id. at 363.

Here, we consider two potential issues: competition for a future RFP and competition within the golf industry. There is no indication that the DEP intends to re-bid the same RFP. Thus, this exemption does not apply on the basis that disclosure would threaten future competition for the RFP. See Tractenberg, 416 N.J. Super. at 379.

The issue of competition within the golf industry, however, requires more consideration. Substantially the same information that is relevant for the purposes of the trade secret and proprietary information exemption is relevant for the purpose of this exemption. Liberty National is concerned that disclosure of its construction and design plans will provide an unfair advantage to other golf courses competing for the same PGA TOUR hosting rights. We find this concern to be justified. See Rousseau, 417 N.J. Super. at 362. Because we are unable to review the contents of Liberty National's bid, we remand for in camera review to ascertain whether the bid includes information that would provide Liberty National's competitors with a competitive advantage in the golf industry.

If the bid contains such information, the judge may consider whether to require disclosure of the entire bid with the exempted portions redacted.

C.

OPRA also includes security exemptions, which preserve the confidentiality of "emergency or security information or procedures for any buildings or facility which, if disclosed, would jeopardize security of the building or facility or persons therein[, and] security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons, property, electronic data or software." N.J.S.A. 47:1A-1.1. These exemptions do "not creat[e] a blanket exception for any and all information about security measures." Gilleran v. Township of Bloomfield, 227 N.J. 159, 173 (2016). However, "[t]he compelled release under OPRA, on demand for any or no reason, of a security system's operational product revealing otherwise nonpublic information about monitoring capability is at odds with the legislative intent in creating security exceptions to OPRA." Id. at 164.

Although our limited case law addressing this exemption has focused on security systems implemented by governmental entities to protect public buildings, see, e.g., Gilleran, 227 N.J. at 170-77, we see no reason to limit the exemption to that concern. The statute's plain language does not restrict its

application to the protection of public spaces, N.J.S.A. 47:1A-1.1, and other OPRA exemptions protect various aspects of private entities', see Rousseau, 417 N.J. Super. at 360-62; Tractenberg, 416 N.J. Super. at 379.  Moreover, Liberty National has hosted and will likely continue to host professional golfing events that attract a lot of people, so it is reasonably concerned for the safety of its property, employees, and patrons.

Liberty National's CFO certified that its bid contained "[s]ensitive security information . . . developed in conjunction with multiple federal and state law enforcement agencies."  The judge did not address this exemption in her oral decision.  Again, as we are unable to review the contents of Liberty National's bid, we remand for in camera review to ascertain whether the bid includes security information that would place at risk the security of Liberty National's facilities or "the safety of persons, property, electronic data, or software."  If the bid contains such information, the judge may consider whether to require disclosure of the entire bid with the exempted portions redacted.

D.

In addition to the exemptions enumerated in the OPRA statute, OPRA incorporates exceptions created by other legal authorities, including regulations.

20

N.J.S.A. 47:1A-9(a). The DEP has designated certain records as not subject to disclosure, including records related to Green Acres land acquisitions:

> Records related to Green Acres, Blue Acres, and Natural Lands Trust land acquisitions, program offerings and active projects, including appraisals, valuations and title investigations, shall be made available for public inspection, examination and copying . . . unless the land transaction, program offering, or active project is actively under negotiation, a binding contract has not been executed, or disclosure of the records would jeopardize the land transaction, program offering. or active project.
>
> [N.J.A.C. 7:1D-3.2(c).]

Our courts have not had the occasion to interpret this regulation. We interpret it as we would interpret a statute, Bedford v. Riello, 195 N.J. 210, 221-22 (2008), so we look to its plain language, DiProspero, 183 N.J. at 492. Where the "language is clear and unambiguous, and susceptible to only one interpretation," we need not look to extrinsic sources. Ibid. (quoting Lozano v. Frank DeLuca Constr., 178 N.J. 513, 522 (2004)).

We read N.J.A.C. 7:1D-3.2(c) as requiring an existing transaction or project for a related record to be exempted. Because the DEP stopped pursuing the RFP, and there has been no indication as to whether it would re-bid the same RFP again, the RFP is no longer an existing project. Thus, none of the conditions for exemption are met. Accordingly, we affirm the judge's

21

determination that N.J.A.C. 7:1D-3.2(c) does not bar disclosure of Liberty National's bid.

III.

We review de novo a decision as to the applicability of the common law right of access to public records. Drinker Biddle & Reath LLP v. N.J. Dep't of Law and Pub. Safety, 421 N.J. Super. 489, 497 (App. Div. 2011).

OPRA does not "limit[] the common[-]law right of access to a government record." N.J.S.A. 47:1A-8. "The common[-]law right of access to public documents provides that a party shall have access to public documents when the party seeking access has an interest in the documents and the party's interest outweighs the public's interest in preventing disclosure." Rousseau, 417 N.J. Super. at 363 (citing Keddie v. Rutgers, 148 N.J. 36, 50 (1997)). Under the common law, a public record is more broadly defined as

> one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done, or a written memorial made by a public officer authorized to perform that function, or a writing filed in a public office.
>
> [Nero v. Hyland, 76 N.J. 213, 222 (1978) (quoting Josefowicz v. Porter, 32 N.J. Super. 585, 591 (App. Div. 1954)).]

22

A party seeking access to a public record "must make a greater showing than required under OPRA[.]" Mason, 196 N.J. at 67. The requestor "must 'establish an interest in the subject matter of the material.'" Ibid. (quoting Keddie, 148 N.J. at 50). The requestor's interest "may be either a wholesome public interest or a legitimate private interest." Drinker Biddle, 421 N.J. Super. at 499 (quoting Educ. Law Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 302 (2009)).

The court must then balance "the citizen's right to access . . . against the State's interest in preventing disclosure." Mason, 196 N.J. at 67-68 (quoting Keddie, 148 N.J. at 50). The court should consider "whether the demand for inspection is premised upon a purpose [that] tends to advance or further" the requestor's interest. S. N.J. Newspapers, Inc. v. Township of Mount Laurel, 141 N.J. 56, 72 (1995) (internal quotation marks omitted) (quoting S. Jersey Publ'g Co. v. N.J. Expressway Auth., 124 N.J. 478, 488 (1991)). The court may also consider several factors in weighing the parties' interests:

> (1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decision[-]making will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative

23

> reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.
>
> [Id. at 73 (quoting Loigman v. Kimmelman, 102 N.J. 98, 113 (1986)).]

Generally, the State's "interest in nondisclosure is based on the need to keep the information confidential." Keddie, 148 N.J. at 51. "However, where the interest in confidentiality is 'slight or non-existent,' standing alone will be sufficient to require disclosure to advance a legitimate private interest." Ibid. (quoting Loigman, 102 N.J. at 105).

Plaintiff has a valid interest in the contents of Liberty National's bid, as it arose from his interest in limiting or preventing development on park space. See Drinker Biddle, 421 N.J. Super. at 499. However, the DEP has an interest in nondisclosure of certain information. Compelling disclosure of trade secrets or security information may discourage bidding for future projects. Although the RFP indicated that the contents of every bid would become public, it also indicated that interested parties would have to file an OPRA request, indicating that the OPRA statute in its entirety still applies. The DEP's interest in protecting future bidders outweighs plaintiff's interest. As we have explained,

plaintiff is still entitled to inspect Liberty National's bid, with the appropriate information redacted. Redaction of this information should still provide plaintiff with an adequate understanding of how Liberty National proposed to develop Caven Point. Accordingly, we reverse the judge's finding that plaintiff's interest was greater than any interest in nondisclosure and her determination that plaintiff was entitled to access the entirety of Liberty National's bid under the common law.

## IV.

In a proceeding to challenge the denial of access to government records, "[a] requestor who prevails . . . shall be entitled to a reasonable attorney's fee." N.J.S.A. 47:1A-6. Plaintiff initiated the action below to compel disclosure of Liberty National's bid, and he was successful. However, we remand for review of the issues previously discussed. If the judge determines that certain information must be redacted before the bid is disclosed, the judge may reconsider the award of attorney's fees. This is supported by language in the October 22, 2018 order awarding plaintiff attorney's fees that any party "may file an appropriate application to modify the counsel fee" if the July 25, 2018 order was modified or reversed on appeal.

A-1527-18T3

To the extent we have not specifically addressed any remaining arguments raised by the parties, we conclude they lack sufficient merit to warrant discussion in a written opinion.  <u>R.</u> 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1527-18T3