**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3457-23

BOROUGH OF SPOTSWOOD,

    Plaintiff-Respondent,

and

JACQUELINE PALMER,

    Plaintiff/Intervenor-
    Respondent,

v.

MIDDLESEX COUNTY
PROSECUTOR'S OFFICE,

    Defendant-Respondent,

and

GANNETT SATELLITE
INFORMATION NETWORK,

    Defendant/Intervenor-
    Appellant/Cross-Respondent,

and

STEVEN WRONKO,

Defendant/Intervenor-
Respondent/Cross-Appellant.

_____

Argued February 2, 2026 – Decided March 5, 2026

Before Judges Sabatino, Natali and Walcott-
Henderson.

On appeal from the Superior Court of New Jersey, Law
Division, Middlesex County, Docket No. L-0563-24.

CJ Griffin argued the cause for appellant/cross-
respondent Gannett Satellite Information Network
(Pashman Stein Walder Hayden, PC, attorneys; CJ
Griffin, on the briefs).

Christina N. Stripp argued the cause for
respondent/cross-appellant Steve Wronko (Cohn
Lifland Pearlman Herrmann & Knopf LLP, attorneys;
Walter M. Luers and Christina N. Stripp, on the briefs).

Kathryn V. Hatfield argued the cause for respondent
Borough of Spotswood (Hatfield Schwartz Law Group
LLC, attorneys; Kathryn V. Hatfield, of counsel and on
the brief; Kevin E. Hakansson, on the brief).

Matthew C. Moench argued the cause for respondent
Jacqueline Palmer (King Moench & Collins, LLP,
attorneys; Matthew C. Moench, on the brief).

Michael S. Williams, Deputy County Counsel, argued
the cause for respondent Middlesex County Prosecutor
(Thomas F. Kelso, Middlesex County Counsel,
attorney; Michael S. Williams, of counsel and on the
brief).

Elizabeth Kern, Deputy Attorney General, argued the cause for amicus curiae State of New Jersey (Jennifer Davenport, Acting Attorney General, attorney; Sookie Bae-Park, Raymond R. Chance, III, and Sara M. Gregory, Assistant Attorneys General, of counsel; Elizabeth Kern and John J. Lafferty, IV, Deputy Attorney General, on the brief).

PER CURIAM

This public access case presents numerous legal issues concerning police body-worn camera ("BWC") recordings. Among other things, we resolve under the applicable statutes whether and when BWC recordings must be destroyed because police officers did not verbally notify a person being filmed that such recordings were being made.

Specifically, we must harmonize N.J.S.A. 40A:14-118.5(r) ("subsection (r)") of the Body Worn Camera Law ("BWCL")—which instructs that "[a]ny recordings from a body worn camera recorded in contravention of this or any other applicable law shall be immediately destroyed and shall not be admissible as evidence in any criminal, civil, or administrative proceeding"—with N.J.S.A. 40A:14-118.5(d) of that statute ("subsection (d)")—which declares that "[t]he failure to verbally notify a person pursuant to this section shall not affect the admissibility of any statement or evidence."

We also consider various other related legal issues posed under the BWCL, N.J.S.A. 40A:14-118.3 to .5, the Open Public Records Act ("OPRA"), N.J.S.A. 47:1A-1 to -13, and the common law.

For the reasons that follow, we hold that the destruction provision in subsection (r) must be sensibly construed to yield in certain situations to the disclosure and evidential use contemplated by subsection (d). Because the trial court reached a contrary legal conclusion and denied the requests of a newspaper chain and a citizen for disclosure of BWC recordings that police officers had filmed in a mayor's office, we reverse those grounds for denial. We also reverse the trial court's determination that the BWC recordings, because they allegedly were improperly made, were not "government records" covered under OPRA.

For the reasons we explain below, the Prosecutor's Office, as custodian of the records, must re-evaluate to what extent discrete redactions from the BWC recordings are warranted under the pertinent statutes, and also re-evaluate access to any such redacted material under the common law. To assure consistency, the trial court's redactions of related Internal Affairs ("IA") documents should also be held in abeyance and re-evaluated.

I.

Given that the appellate record is replete with information that is presently subject to the trial court's unstayed decision prohibiting disclosures, we limit our discussion of the facts and procedural history of this case.

The BWC Recordings and This Lawsuit

Briefly stated, on April 22 and 28, 2022, municipal police officers in Spotswood recorded on BWCs certain conversations that occurred at the Borough's offices involving respondent Jacqueline Palmer, who was then the Mayor of Spotswood, while she was expressing concerns about a visitor who was coming to and remaining in the offices.

Plaintiff Borough of Spotswood filed an order to show cause ("OTSC") in the trial court, seeking to enjoin defendant Middlesex County Prosecutor's Office from releasing the BWC recordings.

The OTSC was opposed by intervenors Gannett Satellite Information Network, LLC ("Gannett") and a citizen requestor, Steven Wronko. They argued that disclosure of the BWC recordings is required under OPRA and the BWCL, or, alternatively, under common-law principles of access.

After initially hearing the OTSC on a sealed basis in January and February 2024, the trial court thereafter issued an order on March 1, 2024, unsealing those

previous oral arguments.  No party filed an emergent application with this court to stay or overturn that order of unsealing.[1]

The trial court then proceeded to consider at ensuing proceedings the merits of the statutory and common-law access issues.  As part of the process, the court undertook <u>in camera</u> review of the BWC footage.  In addition, the court permitted all counsel to have access to the BWC footage on an "eyes only" basis that prevents them from divulging the contents to their clients or others.

<u>The Trial Court's Final Order and Opinion</u>

Ultimately on May 29, 2024, the trial court issued a final order and opinion finding the BWC recordings of April 28, 2022 were not subject to release under the pertinent statutes and common law, but releasing the April 22, 2022 recordings with redactions.  The release of the April 22 recordings, as redacted, is not contested on appeal.

Additionally, the trial court granted release of the IA file containing reports from an investigation into certain police officers' conduct, which included statements and detailed information regarding the BWC recordings, subject to redactions.  The present appeals and cross-appeals ensued.

---

[1]  The notices of appeal do not identify the March 1, 2024 order as one being appealed.  The sole order being appealed and cross-appealed in this case is the trial court's final order dated May 29, 2024.

The Present Appeals and Cross-Appeals

Appellants Gannett and Wronko argue the trial court's denial of disclosure should be reversed because: (1) the court erred in its application of OPRA, the BWCL, and the Attorney General ("AG") Policy ("the AG's Policy"); and (2) in the alternative, the items sought are public records that should be released under the common law.

In direct opposition to appellants, respondents Palmer and the Borough both urge that we affirm the trial court's determinations and bar disclosure.

The other respondent, the Prosecutor's Office, adopts a mixed position. It argues the April 28, 2022 BWC footage was lawfully recorded and that no exceptions to disclosure under the BWCL apply. However, the Prosecutor's Office supports a limited remand to address whether any other OPRA exemptions, apart from those associated with the BWCL, apply, such as for building security and deliberative discussions. The Prosecutor's Office takes no position on whether disclosure is independently warranted under the common law.

Lastly, while this appeal was pending, the AG sought and was granted leave to appear as amicus curiae on behalf of the State. In its brief, the AG argues the trial court erred when it concluded the April 28 BWC recordings are

not "government records" under OPRA, and that, regardless of whether officers "made" the BWC recordings improperly, the recordings nevertheless were "maintained" and "received" by law enforcement and are thereby subject to retention.

The AG argues the trial court further erred by interpreting the BWCL to require destruction or nondisclosure of the BWC recordings, because a failure to warn does not require destruction of those recordings in the circumstances presented. The AG contends the court's application of the BWCL's exemptions was incorrect.

Like the Prosecutor's Office, the AG recommends the case be remanded for the trial court to consider other possible OPRA exemptions, and takes no position on the common-law issues.

Pre-Argument Orders of this Court and the Supreme Court Concerning Livestreaming, Posting of Appellate Briefs, and Related Issues

We conclude the procedural history with a few words about the livestreaming of the appellate oral argument and related matters, as they provide context for the limited nature of the details presented within this opinion.

Pursuant to Supreme Court directives[2], all parties to this appeal were required to submit with their respective merits briefs a certification that their own submissions contain no confidential information or confidential personal identifiers ("COCI"). Every party certified that its own brief did not contain any such confidential information or any confidential personal identifiers. However, Palmer contended in a pre-argument motion to this court that the briefs of one or more of the other parties improperly repeat confidential alleged quotations and "attorney summaries of the contents of restricted videos."

---

[2] On September 3, 2024, the Chief Justice issued a Notice to the Bar, stating that the Appellate Division would begin livestreaming oral arguments and posting publicly filed briefs for matters being argued before the court. Attorneys were "reminded of their obligations – by statute, Court Rule, and other applicable authority – to ensure that filings do not contain confidential information and are redacted in appropriate circumstances. See, e.g., R. 1:38-7; R. 1:38-3." Sup. Ct. of N.J., Notice to the Bar: The New Jersey Judiciary Expands Livestreaming of Oral Arguments to the Appellate Division and Announces the Availability of Publicly Filed Briefs Before the Supreme Court and Appellate Division 1 (Sept. 3, 2024).

The COCI requirement was promulgated by Notice to the Bar dated October 15, 2024. By Notice to the Bar dated March 10, 2025, cases in which trial court proceedings are closed (such as adoptions or terminations of parental rights) are exempt from the Court's livestreaming requirement. The appeals before us do not fall into any of those specifically exempted categories. However, due regard must be given to the importance of not improvidently divulging the contents of impounded material. See R. 1:38-3(f)(4). On the other hand, this court has the authority to discuss otherwise confidential matters in its opinions in its discretion to the extent needed to render a decision and explain its reasoning. R. 1:38-1A.

A-3457-23

Upon the court's preliminary review of these appeals, and in recognition of the fact that the appeals concern BWC recordings and redacted portions of IA documents the trial court declared to be non-disclosable, we permitted any party to file on short notice a motion to exempt the appellate oral argument from being livestreamed.

Palmer filed such a motion, requesting that: (1) the appeal not be livestreamed; (2) the merits briefs not be posted; and (3) the courtroom to the oral argument be closed to the public because "it will essentially disclose details of the BWC footage and OPRA redactions before this [c]ourt decides whether the redacted information and the BWC recordings should be accessible to the public." The Borough joined in Palmer's motion.

Gannett and Wronko opposed the motion, arguing that the appeal must be livestreamed, the merit briefs posted, and the courtroom opened to the public because Palmer had not made the requisite showing under Rule 1:38-11(b) (setting forth the standards to seal court records). The Prosecutor's Office did not object to the requests to have the oral argument exempted from livestreaming. The AG declined to take a position concerning the motions.

In addressing these motions, we were mindful of the general presumption of access of the public and the news media to judicial proceedings, unless

otherwise mandated by statute, court rule, or directives of the Court.  See R. 1:2-1; R. 1:38-11; Hammock by Hammock v. Hoffman-Laroche, 142 N.J. 356, 369-70 (1995).

In an order issued on January 27, 2026, we ruled on movants' three requests, as follows:

> 1.  The motions to preclude the livestreaming of the appellate oral argument [are] DENIED.  However, all counsel are cautioned to refrain during the course of the argument, and afterwards in any communications with non-parties, from describing, quoting from, or otherwise revealing any contents of the BWC recordings that the trial court's unstayed May 29, 2024 order has directed are not subject to disclosure. Counsel shall not divulge or describe those contents during the course of the oral argument, even if they have been referred to in the trial court's opinions, the appellate briefs and appendices, in the news media, or the public domain.
>
> 2.  The motions to close the appellate courtroom to observers are DENIED.  See R. 1:2-1.
>
> 3.  The motions to preclude the posting of the appellate briefs on the Judiciary website are DENIED.  Movants have not moved for specific redactions from the briefs, and there has been ample opportunity for them to have done so before the brink of the oral argument, having received weeks ago the COCIs filed by the other parties.  Unless otherwise directed by the Supreme Court, the briefs will be uploaded at or about 9:00 a.m. on the morning of the appellate oral argument.

4. Any party may file an emergent application with the Supreme Court by no later than 4:00 p.m. on Wednesday, January 28, 2026 to pursue relief from any of the above aspects of this order. If such an emergent application is not filed by that deadline, the livestreamed oral argument will proceed as scheduled on Monday, February 2, 2026, and the briefs will be uploaded that morning. If such an emergent application is timely filed, the livestreamed argument will proceed as planned on February 2 without postponement and with posted briefs, unless the Court otherwise directs.

Palmer timely filed an emergent application with the Supreme Court. She confined her request to bar the appellate livestreaming and discontinued her efforts to prevent the posting of the appellate briefs.

On January 28, 2026, the Court issued a single-justice order, signed on behalf of the Chief Justice, denying Palmer permission to file the emergent application and any related request for a temporary stay or other relief. The Court's denial order included the following instructive terms:

The Appellate Division's January 27, 2026 order denied the movants' requests for relief but imposed conditions to which all parties must adhere during oral argument. Applicant has not demonstrated entitlement to emergent review or other relief in light of the appellate court's order. The parties are reminded to be mindful of the conditions imposed by the Appellate Division's order.

12

In accordance with these orders, the appellate briefs were posted on the morning of the oral argument, and the argument was livestreamed.[3]

We now turn to the merits of the appeal and cross-appeal.

II.

As we noted above, Gannett and Wronko essentially present three arguments on appeal: (1) the trial court erred in finding the April 28, 2022 BWC recordings were protected from disclosure under the BWCL and not subject to disclosure as "government records" under OPRA; (2) the court erred in finding those recordings were not "public records" and therefore not subject to the common-law right to access; and (3) the court should not have redacted certain references to the BWC footage from the IA report.

In assessing these arguments, we are guided by well-established principles of appellate review and statutory construction. An appellate court's review of issues regarding the applicability and interpretation of rules, statutes, and regulations is de novo. In re Ridgefield Park Bd. of Educ., 244 N.J. 1, 17 (2020);

---

[3] Counsel were reminded of the January 27 and 28 orders at the outset of argument and were invited to notify the panel if it appeared the argument was verging into non-disclosable topics. No such notification or objection was raised during the argument. We mention facts within this opinion concerning the April 28 events and BWC recordings to the extent necessary to analyze the issue on appeal. R. 1:38-1A.

Kocanowski v. Twp. of Bridgewater, 237 N.J. 3, 9 (2019). In particular, "determinations about the applicability of OPRA and its exemptions are legal conclusions" and are reviewable de novo. Am. C.L. Union of N.J. v. Cnty. Prosecutors Ass'n of N.J., 474 N.J. Super. 243, 256 (App. Div. 2022) (quoting Carter v. Doe, 230 N.J. 258, 273-74 (2017)).

When undertaking such de novo review on questions of statutory interpretation, our fundamental "responsibility 'is to give effect to the intent of the Legislature.'" State v. Harper, 229 N.J. 228, 237 (2017) (quoting State v. Morrison, 227 N.J. 295, 308 (2016)). "To do so, we start with the plain language of the statute. If it clearly reveals the Legislature's intent, the inquiry is over." Ibid. (citing DiProspero v. Penn, 183 N.J. 477, 492 (2005)).

"If a law is ambiguous, we may consider extrinsic sources including legislative history." Ibid. (citing Parsons ex rel. Parsons v. Mullica Twp. Bd. of Educ., 226 N.J. 297, 308 (2016)). "We also look to extrinsic aids if a literal reading of the law would lead to absurd results." Ibid. (citing Burnett v. Cnty. of Bergen, 198 N.J. 408, 425 (2009)).

Moreover, "a law that is part of a broader 'statutory framework should not be read in isolation'; we instead consider the text 'in relation to other constituent parts so that a sensible meaning may be given to the whole of the legislative

scheme.'"  Id. at 237-38 (quoting Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012)).

Here, as we will discuss in Parts III and IV, infra, concerning the interplay of subsections (d) and (r) of the BWCL with OPRA and other various statutory issues, our task entails an effort to harmonize disparate provisions within the overall statutory scheme.  State v. Gomes, 253 N.J. 6, 27-28 (2023) (exemplifying the importance of the judiciary's role in harmonizing disparate statutory provisions to effectuate the apparent will of the Legislature).

## III.

OPRA

OPRA "requires that government records 'shall be readily accessible' to the citizens of this State, subject to certain exceptions."  Burnett, 198 N.J. at 414 (quoting N.J.S.A. 47:1A-1).  As a matter of law and policy, OPRA declares:

> [G]overnment records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest, and any limitations on the right of access accorded by P.L.1963, c.73 (C.47:1A-1 et seq.) as amended and supplemented, shall be construed in favor of the public's right of access;
>
> [and] all government records shall be subject to public access unless exempt from such access by:  P.L.1963, c.73 (C.47:1A-1 et seq.) as amended and supplemented; any other statute; resolution of either or both houses of

15

the Legislature; regulation promulgated under the authority of any statute or Executive Order of the Governor; Executive Order of the Governor; Rules of Court; any federal law, federal regulation, or federal order . . . .

[N.J.S.A. 47:1A-1.]

"By its very terms, OPRA seeks to promote the public interest by granting citizens access to documents that record the workings of government in some way. That important aim helps serve as a check on government action." Sussex Commons Assocs., LLC v. Rutgers, 210 N.J. 531, 546 (2012).

This policy of transparency is not absolute, however, as "'a public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy.'" Burnett, 198 N.J. at 427 (internal citation omitted).

OPRA applies only to what the statute defines as a "government record":

"[G]overnment record" or "record" means any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained or kept on file in the course of his or its official business by any officer, commission, agency, or authority of the State or of any political subdivision thereof, including subordinate boards thereof, or that

16

has been received in the course of his or its official business by any such officer, commission, agency, or authority of the State or of any political subdivision thereof, including subordinate boards thereof. The terms shall not include inter-agency or intra-agency advisory, consultative, or deliberative material.

[N.J.S.A. 47:1A-1.1 (emphasis added).]

The term "government record" within OPRA does not include information deemed confidential, which includes "any record within the attorney-client privilege" and "emergency or security information or procedures for any buildings or facility which, if disclosed, would jeopardize security of the building or facility or persons therein." Ibid.

As the Court has noted in this regard, "OPRA exempts various documents from disclosure including records protected by the attorney-client privilege, inter- or intra-agency advisory, consultative, or deliberative material, pedagogical records at a public institution of higher education, and information that must be kept confidential pursuant to court order." Sussex Commons Assocs., 210 N.J. at 542 (citing N.J.S.A. 47:1A-1.1).

Furthermore, N.J.S.A. 47:1A-9(b) declares that OPRA:

[S]hall not abrogate or erode any executive or legislative privilege or grant of confidentiality heretofore established or recognized by the Constitution of this State, statute, court rule or judicial case law, which privilege or grant of confidentiality

A-3457-23

may duly be claimed to restrict public access to a public record or government record.

BWCL and Attorney General Policies

In 2020, the Legislature enacted the BWCL, L. 2020, c. 128 (codified at N.J.S.A. 40A:14-118.3 to .4), which required every patrol officer to wear a body camera. This mandate was in conjunction with L. 2020, c. 129 (codified at N.J.S.A. 40A:14-118.5), which "regulate[d] the use of [BWCs] worn by law enforcement officers" throughout the State, A. 4312 (2020) (first reprint), delineating the circumstances under which a BWC may be deactivated, restricting the use of BWCs in certain circumstances, and specifying the retention periods for recorded footage.

Beginning June 1, 2021, all uniformed patrol law enforcement officers "shall wear a body worn camera that electronically records audio and video while acting in the performance of the officer's official duties." N.J.S.A. 40A:14-118.3(a). The statute lists exceptions to the BWC requirement, including any that "may be . . . provided in accordance with guidelines or directives promulgated by the Attorney General." N.J.S.A. 40A:14-118.3(a)(8).

Generally, "the video and audio recording functions of a body worn camera shall be activated whenever the officer is responding to a call for service or at the initiation of any other law enforcement or investigative encounter

18

between an officer and a member of the public. . . ."  N.J.S.A. 40A:14-118.5(c)(1).  Pursuant to this subsection, "[t]he body worn camera shall remain activated until the encounter has fully concluded and the officer leaves the scene."  Ibid.

The BWCL's Notification Provisions

As noted in our introduction above, subsection (r) of the BWCL states that "[a]ny recordings from a body worn camera recorded in contravention of this or any other applicable law shall be immediately destroyed and shall not be admissible as evidence in any criminal, civil, or administrative proceeding."  N.J.S.A. 40A:14-118.5(r).

However, of particular relevance here, BWCL subsection (d) directs that "[a] law enforcement officer who is wearing a body worn camera shall notify the subject of the recording that the subject is being recorded by the body worn camera unless it is unsafe or infeasible to provide such notification."  N.J.S.A. 40A:14-118.5(d).  Moreover, subsection (d) further declares that "[t]he failure to verbally notify a person pursuant to this section shall not affect the admissibility of any statement or evidence."  Ibid.[4]

---

[4]  We address the tension between these subsections in Part IV, infra.

<u>The AG's Policy</u>

In January 2022, the New Jersey AG's Office issued an update to its BWC Policy. <u>See</u> Off. of the Att'y Gen., Law Enf't Directive No. 2022-1, <u>Update to Body Worn Camera Policy</u> (Jan. 19, 2022) ("the AG's Policy"). The update contained a revision to section 10.3 of its 2021 Policy, which limited when officers could review a BWC recording, to reflect that the law now "generally permits officers to review such recordings before creating required initial reports, statements, or interviews, with six exceptions delineated in the statute." <u>Id.</u> at 1. There were also several minor changes, one being that the new Policy "clarifies that BWC footage recorded in contravention of this Policy or any other applicable law shall not be admissible as evidence in any criminal, civil, or administrative proceeding, except as evidence in any proceeding related to the unauthorized use of a BWC." <u>Id.</u> at 2. The directive went on to state, in part, that "[n]othing in this Directive shall be construed in any way to create any substantive right that may be enforced by any third party." <u>Id.</u> at 3.

The AG's Policy states at section 4.2 that "[t]he failure to verbally notify a person pursuant to this section shall not affect the admissibility of any statement or evidence," which tracks N.J.S.A. 40A:14-118.5(d). The AG's Policy § 4.2; <u>cf.</u> N.J.S.A. 40A:14-118.5(d).

20

Under section 5.1 of that same Policy, a BWC shall only be activated in performance of official police duties "for the purpose of recording incidents, investigations, and police-civilian encounters involving those law enforcement activities specified in this Policy, or specified in a department's policy, standing operating procedure, directive, or order promulgated pursuant to this Policy." Id. § 5.1. The section instructs that a BWC should not be activated "while the officer is on break or otherwise is not actively performing law enforcement functions (e.g., while eating meals, while in a restroom, etc.)" and that it should "not be activated or used by an officer for personal purposes, or when engaged in police union business." Ibid.

Section 5.1 further states that a BWC should not be used "to record conversations involving counseling, guidance sessions, personnel evaluations, or any similar supervisory interaction." Ibid. In a related vein, under section 6.5 of the AG's Policy, "a BWC-equipped officer may de-activate a BWC while participating in a discussion pertaining to criminal investigation strategy and planning" in certain situations, "provided that the strategy/planning discussion is not conducted in the immediate presence of a civilian." Id. § 6.5.

Section 7.7 of the AG thePolicy elaborates upon N.J.S.A. 40A:14-118.5(g), which states that "[a] body worn camera shall not be used surreptitiously." N.J.S.A. 40A:14-118.5(g). Under section 7.7:

> [A] BWC shall not be used to gather intelligence information based on First Amendment protected speech, associations, or religion, or to record activity that is unrelated to a response to a call for service or a law enforcement or investigative encounter between a law enforcement officer and a member of the public, provided that nothing in this subsection shall be construed to prohibit activation of video and audio recording functions of a BWC as authorized under the law or this Policy.
>
> [The AG's Policy § 7.7.]

Reviews of BWC recordings[5] are permitted in accordance with the provisions of N.J.S.A. 47:1A-1. Fuster v. Twp. of Chatham ("Fuster II"), 259 N.J. 533, 551 (2025). Therefore, pursuant to the Supreme Court's decision in Fuster II, OPRA applies to BWC recordings, and BWC recordings are also subject to the same exemptions set forth under OPRA, as described below.

---

[5] The parties have advised us that transcripts of the audio tracks of the April 28 BWC recordings have not been made. We have viewed the pertinent portions of the videos and have concluded we do not need such audio transcripts for purposes of our review in this case.

22

OPRA Exemptions

The access to records afforded by OPRA is limited in N.J.S.A. 47:1A-1.1 by a list of information that is "deemed to be confidential" and thus does not qualify as a government record subject to public access under the statute.

Among other things, the list includes exemptions for "any record within the attorney-client privilege," as well as "emergency or security information or procedures for any buildings or facility which, if disclosed, would jeopardize security of the building or facility or persons therein." N.J.S.A. 47:1A-1.1.

A third exemption potentially relevant here is for:

> [S]ecurity alarm system activity and access reports, including video footage, for any public building, facility, or grounds unless the request identifies a specific incident that occurred, or a specific date and limited time period at a particular public building, facility, or grounds, and is deemed not to compromise the integrity of the security system by revealing capabilities and vulnerabilities of the system. . . .
>
> [Ibid.]

Furthermore, pursuant to N.J.S.A. 47:1A-9(b), a record could be exempt if it "abrogate[s] or erode[s] any executive or legislative privilege or grant of confidentiality" which may be claimed to restrict public access.

In addressing the emergency or security information exemption, the Court has stated that "[t]he words used by the Legislature in the applicable exemptions

23                                                                    A-3457-23

capture categories of information." Gilleran v. Bloomfield, 227 N.J. 159, 172 (2016) (where the court found that the request for a day's worth of video footage from a stationary security camera attached to a town hall was not subject to disclosure under OPRA because of the emergency or security information and security measures exemptions). The Court in Gilleran found that the disclosure of "security information or procedures" would jeopardize security of public buildings only when it would create a risk for property and persons. Id. at 172-74 (quoting N.J.S.A. 47:1A-1.1). There, releasing a day's worth of video footage could reveal vulnerabilities within the operational system and thus create a risk to public safety. Id. at 164. As made clear from Gilleran, there must be some showing of how the information requested would meet the security information exemption under OPRA either by jeopardizing building security or risk safety to people or property. Id. at 172-74; N.J.S.A. 47:1A-1.1.

BWCL Exemptions and Retention Requirements

The BWCL prescribes that a BWC recording "shall be retained for not less than 180 days from the date it was recorded" unless it meets certain criteria, the first being "if it captures images involving an encounter about which a complaint has been registered by a subject of the body worn camera recording." N.J.S.A. 40A:14-118.5(j)(1).

24

Additionally, under subsection (j) of the BWCL, a BWC recording shall be retained for a longer period—not less than three years—in the following instances:

> (a) the law enforcement officer whose body worn camera made the video recording, if that officer reasonably asserts the recording has evidentiary or exculpatory value;
>
> (b) a law enforcement officer who is a subject of the body worn camera recording, if that officer reasonably asserts the recording has evidentiary or exculpatory value;
>
> (c) any immediate supervisor of a law enforcement officer whose body worn camera made the recording or who is a subject of the body worn camera recording, if that immediate supervisor reasonably asserts the recording has evidentiary or exculpatory value;
>
> (d) any law enforcement officer, if the body worn camera recording is being retained solely and exclusively for police training purposes;
>
> (e) any member of the public who is a subject of the body worn camera recording;
>
> (f) any parent or legal guardian of a minor who is a subject of the body worn camera recording; or
>
> (g) a deceased subject's next of kin or legally authorized designee.
>
> [N.J.S.A. 40A:14-118.5(j)(2).]

In particular, "[t]o effectuate subparagraphs (e), (f), and (g)" of subsection (j) above, "the member of the public, parent or legal guardian, or next of kin or designee shall be permitted to review the body worn camera recording in accordance with the provisions of P.L.1963, c.73 (C.47:1A-1 et seq.) to determine whether to request a three-year retention period." N.J.S.A. 40A:14-118.5(k).

Moreover, notwithstanding subsections (j)(1) and (j)(2), the BWCL imposes three additional retention requirements, of which only one applies here: "[W]hen a body worn camera records an incident that is the subject of an [IA] complaint, the recording shall be kept pending final resolution of the [IA] investigation and any resulting administrative action." N.J.S.A. 40A:14-118.5(j)(3)(c).

That said, there are four specified instances under the BWCL in which a BWC recording shall be exempt from public inspection:

> Notwithstanding that a criminal investigatory record does not constitute a government record under section 1 of P.L.1995, c.23 (C.47:1A-1.1), only the following body worn camera recordings shall be exempt from public inspection:
>
> > (1) body worn camera recordings not subject to a minimum three-year retention period or additional retention requirements pursuant to subsection j. of this section;

(2) body worn camera recordings subject to a minimum three-year retention period <u>solely and exclusively</u> pursuant to paragraph (1) of subsection j. of this section if the subject of the body worn camera recording making the complaint requests the body worn camera recording not be made available to the public;

(3) body worn camera recordings subject to a minimum three-year retention period <u>solely and exclusively</u> pursuant to subparagraph (a), (b), (c), or (d) of paragraph (2) of subsection j. of this section; and

(4) body worn camera recordings subject to a minimum three-year retention period <u>solely and exclusively</u> pursuant to subparagraph (e), (f), or (g) of paragraph (2) of subsection j. of this section if a member, parent or legal guardian, or next of kin or designee requests the body worn camera recording not be made available to the public.

[N.J.S.A. 40A:14-118.5(*l*) (emphasis added).]

IV.

Having canvassed these elaborate provisions, we turn to the legal arguments presented to us.

A.

As we previewed above, a key issue for our resolution concerns the interplay of subsections (d) and (r) in N.J.S.A. 40A:14-118.5. In the trial court

proceedings and in their appellate briefs, Palmer[6] and the Borough invoked N.J.S.A. 40A:14-118.5(r), which states that "[a]ny recordings from a body worn camera recorded in contravention of this or any other applicable law shall be immediately destroyed and shall not be admissible as evidence in any criminal, civil, or administrative proceeding."

On the other hand, appellants, the Prosecutor's Office, and the AG have countered that the language of subsection (d), which declares that "the failure to verbally notify a person pursuant to this section shall not affect the admissibility of any statement or evidence," must be read to qualify the destruction language of subsection (r).

The trial court's May 29, 2024 decision recognized this seeming dissonance between the provisions. Ultimately, the court concluded, among other things, that because police officers who recorded conversations on the second floor of the Borough offices on April 28, 2022 did not apparently provide Palmer with oral notification that they were recording her on their body-worn cameras, the BWC footage was improperly obtained and should have been

---

[6] At the appellate oral argument, counsel for Palmer clarified that her arguments for non-disclosure did not solely rest on the lack-of-notification language within the statute, and that affirmance of the trial court's decision can rest independently on other grounds.

28                                                                    A-3457-23

destroyed under subsection (r). We respectfully disagree with that legal determination.

When interpreting a whole statute, "each part or section should be construed in connection with every other part or section to provide a harmonious whole." 2A Norman J. Singer & Shambie Singer, Sutherland Statutory Construction § 46.4, at 204 (7th ed. 2014) [hereinafter Sutherland]. "A statutory subsection may not be considered in a vacuum, but must be considered in reference to the statute as a whole and in reference to statutes dealing with the same general subject matter." Id. § 46.5, at 225-26; see also Gomes, 253 N.J. at 27-29; Williams v. N.J. State Parole Bd., 255 N.J. 36, 51 (2023).

"[W]here a general provision in a statute has certain limited exceptions, all doubts should be resolved in favor of the general provision rather than the exceptions." 2A Sutherland, § 47.11, at 330; see also Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 109 (2010); Prado v. State, 186 N.J. 413, 426-27 (2006). In Fuster II, the Supreme Court reiterated that courts must "'strive for an interpretation that gives effect to all of the statutory provisions and does not render any language inoperative, superfluous, void or insignificant.'" 259 N.J. at 547 (quoting G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 172 (1999)).

In light of these principles reaffirmed by the Supreme Court in Fuster II, N.J.S.A. 40A:14-118.5(r) should not be read to require destruction of the BWC recordings for a failure to notify, because doing so would render the evidentiary terms of N.J.S.A. 40A:14-118.5(d) superfluous. The officers' failure to notify Palmer verbally and individually of the recordings did not automatically require their destruction and does not render them inadmissible pursuant to subsection (r).

The trial court erred in finding that subsection (r) controls over the specific language of subsection (d). If the immediate-destruction language of subsection (r) were rigidly implemented, there would be no recording preserved for possible future evidential use under subsection (d). That cannot be what the statute was intended to mean.

We note that this more sensible interpretation of the subsections aligns not only with those of the Prosecutor's Office and the appellants, but also corresponds with the amicus position of the AG, who has promulgated the BWC policies we have described above. Generally, we "pay significant attention to the legal position of the [AG], the 'sole legal adviser' to state government concerning the interpretation of 'all statutes' that affect state agencies." State v. Coviello, 252 N.J. 539, 557 (2023) (citing N.J.S.A. 52:17A-4(e)); see also Peper

v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 70 (1978) (delineating the principle that courts "should attach weight to the Attorney General's [legal] opinion").

We also take judicial notice that the AG, who frequently is involved in public access litigation on behalf of custodians of records for State agencies, is adopting here an interpretation of this facet of the statutory scheme that happens to be consistent with that of the requestors. Although we certainly are not bound by the AG's legal position, it soundly aligns in this instance with a common-sense interpretation of the BWCL and reinforces our confidence in our ruling.

B.

Apart from this textual analysis that resolves the legal import of a lack of a verbal warning, our de novo review of the record also differs from the trial court's other grounds for finding that the BWC recordings were improperly created.

The trial court concluded the BWC recordings made on the second floor of the municipal building, where the mayor's office is located, were not part of a continuous event, and that the officers thereby were all obligated to turn off their cameras and leave them off when they came upstairs. However, the record reflects sufficient continuity between the officers' upstairs and downstairs activities.

31

On April 28, 2022, the officers were on duty, responding to calls for service, and following orders from their superiors. The recordings were relevant to a single call for service. The initial call for service came in at 9:09 a.m. from someone in Palmer's office regarding the visitor's presence on the second floor. Two officers received calls from dispatch at this same time and arrived on location at the municipal building at 9:12 a.m. Both officers activated their BWCs and proceeded to record interactions related to the call for service.

The AG's Policy identifies specific instances when a BWC should not be activated, including "while eating meals" or "while in the restroom," neither of which pertains here. The AG's Policy § 5.1. The AG's Policy also states that BWC recordings should not be used for "personal purposes, or when engaged in police union business." Id.

Here, officers appropriately notified occupants in the office that they were recording "audio and video" at 9:17 a.m. They also deactivated their BWCs whenever they were not actively in response to the situation and reactivated them as the situation unfolded. Less than ten minutes from the last deactivation, both officers reactivated their BWCs, as confirmed by a superior officer, and continued to record the events that transpired between their superiors and the mayor. The officers remained involved in the calls for service regarding the

32

visitor and were continuing the performance of their duties as they met with the mayor.

The trial court gave significant weight to the fact that one officer who was present during the meeting with the mayor did not reactivate his BWC, despite having previously done so earlier. However, that one officer's individual failure to initiate his BWC does not dispositively establish that the meeting with Palmer was not part of a continuous event and therefore not in the performance of official duties.

As the AG's Policy notes, BWCs "serve as a powerful deterrent to misconduct by both the police and members of the public interacting with police." Id. § 1.1 (emphasis added). That goal of mutual deterrence must not be overlooked here. In many instances, a video or audio recording can be the best evidence of what happened and what was said. See N.J.R.E. 1001 to 1008 ("the best evidence rule" provisions); see also State v. Knight, 477 N.J. Super. 400, 422-24 (App. Div. 2023), aff'd, 259 N.J. 407 (2024).

The arguments of Palmer and the Borough that the upstairs BWC recordings lacked a sufficient nexus to the incident with the visitor are mistaken. The meeting between the officers and the mayor manifestly was about the incidents with the visitor, both regarding complaints about his presence from

that morning and the previous situation with him that had occurred six days earlier on April 22, 2022.

We also part company with the trial court's finding that the BWC recordings of conversations in which the mayor was speaking were surreptitious and thereby violated subsection (g) of the BWCL. The BWCL does not define the term "surreptitious." Black's Law Dictionary 1752 (12th ed. 2024) defines the term "surreptitious" as "([o]f conduct) unauthorized and clandestine; done by stealth and without legitimate authority." See also State v. Zembreski, 445 N.J. Super. 412, 428 (App. Div. 2016) (applying the "stealth" aspect of "surreptitiously" in the context of evaluating whether an entry into a dwelling was surreptitious). For example, in State v. Martinez, 461 N.J. Super. 249, 254 (App. Div. 2019), we noted that an assistant prosecutor had "authorized the surreptitious taping" of a defense attorney's pre-trial interview of an informant, because of information that the defense attorney "might offer the witness a bribe." The informant in Martinez wore body wires concealed under clothing and was attempting to capture the defense attorney offering a bribe. Ibid.

The present situation is not comparable. Here, the body worn cameras were visible on the fronts of the officers' garments, with red lights and periodic beeping when they were activated during the course of the approximately thirty-

minute-long overall encounter. Before the recorded discussion at issue here took place upstairs, officers had been present on that floor earlier in the mayor's office and announced that they were recording, while Palmer was in her office, with the door open. Although we acknowledge that the officers did not repeat an announcement to the mayor personally when they returned upstairs, that omission is not sufficient to establish a "clandestine" or "stealth" course of recording.

We have given due regard to the trial court's reasons for concluding the recording was surreptitious, but those reasons fail as a matter of law to substantiate the "stealth" required to support that characterization. It is indisputable that the BWCs worn by two officers in the small office were only a few feet away, with no persons, furniture, or other obstructions between them and the mayor. It is likewise indisputable that the BWCs were not covered up or otherwise concealed. The officers did not mislead the mayor and pretend that the BWCs were off while they were blinking and beeping.

Although the trial court found it significant, we do not afford much weight to the fact that another officer was the one speaking with the mayor rather than the two officers whose BWCs were activated. There is no objective indication that the other officer was attempting to distract the mayor from seeing the

activated cameras.  Nor are we persuaded that the timing of the activation or numerical variations in the time stamps establish stealth.

In sum, although we afford due deference to the trial court's factual findings in general, we decline to adopt "blind adherence" to this specific finding of surreptitiousness.  State v. S.S., 229 N.J. 360, 381 (2017).  We therefore do not rely on that finding in our analysis and instead conclude that N.J.S.A. 40A:14-118.5(g) is inapplicable.

We also decline to adopt the trial court's finding that destruction and non-disclosure of the BWC recordings were required to protect the mayor's asserted privacy interests.  In this regard, the trial court relied on this court's then-extant opinion in Fuster I, in which we ruled that the OPRA exemption in N.J.S.A. 47:1A-9(b) precluded disclosure of the BWC recording at issue in that case "because our case law has long-established that information received by law enforcement regarding an individual who was not arrested or charged is confidential and not subject to disclosure."  Fuster v. Twp. of Chatham, 477 N.J. Super. 477, 483 (App. Div. 2023) ("Fuster I"), rev'd, 259 N.J. 533 (2025).  Fuster I concerned an individual seeking his own video-recorded statement who was found not to be entitled to receive the footage because "[g]overnment records involving 'a person who has not been arrested or charged with an offense are

entitled to confidentiality based upon long-established judicial precedent.'" Id. at 489-90.

In the interim, while this appeal was pending, the Supreme Court in Fuster II reversed our opinion. See Fuster II, 259 N.J. at 540. The Supreme Court ruled the plaintiff there was entitled to access the BWC recording. Ibid. The Court recognized that the OPRA exemptions might apply to BWCs, id. at 539, but concluded that "OPRA does not contain any explicit exemption for 'information received by law enforcement regarding an individual who was not arrested or charged.'" Ibid. (quoting Fuster I, 477 N.J. Super. at 483). Hence, the trial court's reliance on Fuster I is, at the very least, unhelpful to its confidentiality analysis because the mayor was not arrested or charged.

The statutory exception for attorney-client communications, N.J.S.A. 47:1A-1.1, also does not compel the wholesale withholding of the BWC recordings. The mayor was not communicating with the Borough attorney or a personal lawyer on the BWC footage. While the police chief did refer in the discussion to advice the Borough attorney had provided to him, those limited portions can nevertheless be redacted.[7]

---

[7] See our forthcoming discussion, infra at Part V, regarding a redaction process.

The trial court referred to portions of the discussions on the BWC recordings about future strategy for dealing with security issues posed by visitors in the municipal building. We concur with the trial court that those portions of the recorded interactions could fall within OPRA's exemption for "security measures and surveillance techniques which, if disclosed, would create a risk to the safety of persons." See N.J.S.A. 47:1A-1.1; see also N.J.A.C. 13:1E-3.2(a)(2); The AG's Policy § 7.3. In addition, we are mindful the court appropriately identified possible non-disclosure of "conversations involving counseling, guidance sessions, or . . . similar supervisory interaction[s]." The AG's Policy § 5.1. But, subject to redaction of those portions, we do not conclude they justify the court's overall determination that the BWC recordings were "not made in the performance of official duties."

C.

Even assuming, for the sake of discussion, that the BWC recordings in the mayor's office on April 28 were, in full or in part, improperly made, such a determination does not dictate whether the recordings were "government records." That is because, as the AG and appellants have persuasively argued, OPRA defines government records to not only cover records "made" by a public body or official but also cover records that have been "maintained or kept on

38

file," or "received" in the course of official business. N.J.S.A. 47:1A-1.1; see also Commc'ns Workers of Am. v. Rousseau, 417 N.J. Super. 341, 355 (App. Div. 2010) (describing OPRA's definition of "government record" as "expansive"); Gannett N.J. Partners, LP v. Cnty. of Middlesex, 379 N.J. Super. 205, 213 (App. Div. 2005) (same). The definitional terms in OPRA—including "[m]ade," "maintained," "kept on file," or "received"—are broad terms that encompass a host of ways that a government agency might obtain a record. N.J.S.A. 47:1A-1.1.

Thus, even if we did agree, as the trial court found, that police officers "made" the BWC recordings in a manner inconsistent with aspects of the BWCL or the AG's Policy, the question then becomes whether the Borough Police Department and the Prosecutor's Office had legitimate grounds to receive and maintain those recordings, subject to any pertinent exemptions or redactions. The answer is yes.

As we noted above, the BWCL includes a detailed retention protocol that generally requires longer retention periods for BWC recordings designed to advance the statute's goals of transparency and accountability. N.J.S.A. 40A:14-118.5(j) sets forth a minimum retention period of 180 days for all BWC recordings, and expands this period based on specific characteristics of the

footage. BWC recordings capturing an encounter about which a complaint has been registered, or which capture an arrest, use of force, or "records an incident that is the subject of an internal affairs complaint" are subject to longer retention periods. N.J.S.A. 40A:14-118.5(j)(2)-(3).

Once the Borough attorney lodged an IA complaint about the recordings on August 4, 2022, the Borough was obligated to "maintain" these recordings for purposes of its investigation. N.J.S.A. 40A:14-118.5(j)(3)(c) ("[W]hen a body worn camera records an incident that is the subject of an internal affairs complaint, the recording shall be kept pending final resolution of the internal affairs investigation and any resulting administrative action."); see also The AG's Policy § 8.4(c) (same). Even if there was some question about the officers' decision to activate their BWCs during this incident, because the Borough maintained the recordings for purposes of its IA investigation pursuant to statute and directive, they were "maintained" as government records for the purposes of OPRA. The trial court acknowledged that the "BWC footage should have been presented to the [Prosecutor's Office] once the Spotswood IA determined the recordings were obtained in contravention of AG directives" but the court did not recognize the significance of that fact for the purposes of its "government record" analysis.

Further, the Prosecutor's Office "received" and "maintained" these same recordings in the course of its official business within the meaning of N.J.S.A. 47:1A-1.1. Hence, because the Prosecutor's Office "received" the BWC recordings to discharge its own official obligations, the court erred by finding they were not "government records" under OPRA.

D.

We further decline to adopt the trial court's application of the exemptions to public access set forth in N.J.S.A. 40A:14-118.5(*l*). Subsection (*l*) lists four circumstances when BWC recordings are exempt from public disclosure. The trial court relied on two of those provisions, subsection (*l*)(2) and (*l*)(3), to conclude that the BWCL's provisions exempted the recording from access. But those provisions do not mandate non-disclosure here.

Under subsection (*l*)(2), exclusion from public access is warranted if footage is retained "solely and exclusively" because the subject of the recording made a complaint under subsection (j)(1). Likewise, exclusion from public access is called for under (*l*)(3) only if footage is retained "solely and exclusively" if the law enforcement officer who captured or is the subject of the recording or a supervisor "reasonably asserts" that the recording has

41

"evidentiary or exculpatory value," or if the recording is kept exclusively for training purposes, under subsections (j)(2)(a)-(d).

These exclusions under subsection (j) are not controlling in the present case. The BWC recordings were not retained "solely and exclusively" because of the mayor's complaint, but were retained for the IA investigation and other investigatory purposes. The recordings also were not retained "solely and exclusively" at the officers' request under subsections (j)(2)(a)-(d). Hence, the trial court's determination that the BWC footage was exempt from public access under N.J.S.A. 40A:14-118.5(j) was incorrect.

Palmer has raised concerns that any time a citizen captured in a body worn camera recording files a complaint against the officer for allegedly improperly recording, the body worn camera recording would automatically become discoverable under OPRA. However, the BWCL provides for specific instances that can render such a video exempt from disclosure. See N.J.S.A. 40A:14-118.5(*l*).

If an individual is a subject of the body worn camera recording and lodges a complaint against the officer for recording, the individual can request the recording be exempt from being released to the public. Additionally, as we also noted above, N.J.S.A. 40A:14-118.5(*l*)(1)-(4) refers to multiple provisions of

N.J.S.A. 40A:14-118.5(j)(1)-(3), which provide specific situations when the recording can be exempt from release.

V.

For these various reasons, the trial court erred by categorically determining the BWC recordings at issue should have been destroyed rather than maintained and were not "government records" within the scope of OPRA. Consequently, we reverse that determination, subject to a forthcoming application of any pertinent OPRA exceptions that may warrant discrete redactions.

The practical question then arises as to who should perform those redactions. Although the trial court has already identified certain redactions without the benefit of our present opinion, we agree with appellants that the more appropriate party to perform a finalized redaction process is the Prosecutor's Office, the records custodian on whom the OPRA request was served. N.J.S.A. 47:1A-5(g).

Similarly, having overturned the trial court's statutory finding that the BWC recordings are not "government records" under OPRA, we discern no necessity at this time to perform a de novo analysis of the trial court's provisional common-law determination. A common-law assessment would now be confined

43

to only those portions of the government records that will be finally redacted under OPRA.

The trial court's common-law ruling is accordingly vacated without prejudice. Upon deciding what redactions should be made under OPRA, the Prosecutor's Office, utilizing the pertinent balancing tests, should also determine what, if any, of those materials should be produced under the common law.

Lastly, to assure overall consistency, the redactions of the IA reports ordered by the trial court to omit non-disclosable BWC information shall be held in abeyance pending further developments. The IA reports therefore shall continue to be withheld until such time as the BWC redaction process is completed, and, if necessary, relitigated.

Conclusion

Within sixty (60) days of this opinion, the Prosecutor's Office shall issue an updated determination to counsel for the requestors Gannett, Wronko, Palmer, and the Borough, on an "eyes only" basis, conveying any proposed redactions it deems are warranted under other OPRA exceptions that have not been specifically adjudicated here or under the common law. If any party objects to those redactions, they may file a new civil action in the Law Division.

If such a new case is brought, the Law Division then shall evaluate the redactions in camera and render a fresh judicial determination, which may then be appealable by an aggrieved party in the normal course. As part of its analysis of the contested redactions, the Law Division shall not only consider statutory factors but also whether the redacted content should be obtainable, in full or in part, under the common law. The common-law analysis of the redactions should be performed anew and is not necessarily dictated by the trial court's previous May 29, 2024 common-law ruling.

That said, we stay our opinion, sua sponte, for thirty (30) days to enable any aggrieved party to file a petition or motion with the Supreme Court for review; if such review is sought, the stay will remain in effect until such time as the Court otherwise directs. During that interim stay, the prohibitions on disclosure ordered by the trial court in its May 29, 2024 decision shall remain in effect. Any issues of alleged noncompliance shall be presented and decided in the first instance in the trial court, which shall have jurisdiction over such disputes.

We close with an express recognition that this matter has involved a complicated array of provisions under OPRA, the BWCL, the AG's Policy, and case law. Given that complexity, we express our appreciation for the efforts of

A-3457-23

the trial court, counsel for the five parties, and the amicus AG, to assist us in navigating the thorny issues.

Reversed in part and modified in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division